UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS


JOHN W. DORMEVIL,                )
                                 )
          Plaintiff,             )    CIVIL ACTION NO.
                                 )    12-10260-DPW
v.                               )
                                 )
COMMUNITIES FOR PEOPLE, INC.,    )
                                 )
          Defendant.             )


                       MEMORANDUM AND ORDER
                          April 11, 2014

     The plaintiff, John Dormevil, was hired by the defendant, Communities for People, Inc., on a three-month probationary basis as a house manager for a group residence for young men.  At the end of that three-month period, CFP terminated Mr. Dormevil's employment.  CFP contends that it fired Mr. Dormevil because his job performance was unsatisfactory.  In his complaint, Mr. Dormevil claims that the actual reason for his firing was gender bias.

     The parties have filed cross-motions for summary judgment.  In his motion for summary judgment, Mr. Dormevil appears now also to claim that his termination was improper because CFP failed to comply with the policies and procedures set forth in its Personnel Policies and Procedures Manual.  Mr. Dormevil has also made passing reference to a claim for defamation predicated on statements made by CFP in its termination letter.  For its part, CFP contends that Mr. Dormevil's termination was proper, that it

was not motivated by gender bias, that CFP did not violate any contractual promises and that CFP did not engage in any actionable defamation.

I.   FACTUAL BACKGROUND

*A.  The Hiring of Mr. Dormevil at CFP*

CFP is an operator of five residential facilities for troubled teens and young adults. On or around May 19, 2008, CFP hired Mr. Dormevil for a position as a house manager for the Richardson House, a group residence for young men. The decision to hire Mr. Dormevil was made by Daniel Reardon, a CFP program manager, and Yolanda Cloete, who is the CFP program director. At the time of his hire, Mr. Dormevil was the lone male house manager.

As a house manager at the Richardson House, Mr. Dormevil's responsibilities included running the day-to-day operations of the Richardson House, ensuring that the residence was staffed during operating hours, and ensuring that staff adhered to all CFP policies. As program manager, Mr. Reardon was responsible for supervising Mr. Dormevil.

*B.  CFP's Personnel Policies and Procedures Manual*

At the time of his hire, Mr. Dormevil signed a document acknowledging receipt of CFP's Personnel Manual. That document states:

> I have received a copy of the Personnel Policies
> Manual; and I have read it and understand the contents
> of the manual. I agree that my employment is
> terminable-at-will, so that both [CFP] and I remain
> free to end our work relationship at any time, with or
> without notice. I understand that this manual has been
> prepared for the information and guidance of employees
> working at [CFP]. It is intended to cover the
> procedures, rules and policies most often applied to
> our day-to-day work activities. Some of the
> information will change since our policies may at times
> by [sic] under review and are revised when appropriate.
> I understand that I will be notified of such changes.
>
> I understand that there is no guarantee of employment
> made to any employee member, either expressly or
> implied, in this manual.

Mr. Dormevil does not contest signing this document, but contends that it refers to a different version of the Personnel manual than the version provided by CFP as an exhibit to its motion for summary judgment. As he points out, the version relied upon by CFP indicates that it is "Revised February 2011"-- after Mr. Dormevil had been terminated by CFP. He was supplied an earlier version, dated August 1, 2007.

Distinctions between the versions, however, appear to make no difference here. Both the version relied upon by Mr. Dormevil in his opposition to summary judgment and that relied upon by CFP contain similar, if not identical, relevant language. Both explain, in a section entitled "Function & Use of the Personnel Policies & Procedures Manual," that the "policies and procedures outlined in this manual should be regarded as management guidelines only, which in a developing organization will change

3

from time to time," and that the "Personnel Policies and Procedures Manual (and other plan documents) are not contractual in nature and do not guarantee any continuation of benefits." The manual continues: "[CFP] adheres to the policy of employment-at-will, which permits the Agency or the employee to terminate the employment relationship at any time, for any reason."

Both versions of the manual also include a section titled "At-Will Statement," which reads: "The employee understands that any employment at [CFP] is at-will and of indefinite duration, and that either the employee or [CFP] may terminate employment at any time, with or without notice, for any reason."

In addition, both versions of the manual discuss an "Introductory Period" and both explain:

> Whenever the term "introductory period" is used in the Personnel Policies Manual, it shall mean the first three months of employment by a newly hired or re-hired employee. The purpose of the introductory period is to ensure and verify that each employee has the skills and motivation necessary to perform the duties and responsibilities of the position. Employees whose service is satisfactory in the introductory period may become regular full-time or part-time employees, subject to availability of funds, the continued existence of the position, and continued satisfactory work performance in the position.
>
> An employee may be terminated at any time during and after the introductory period if his/her performance fails to meet minimum performance standards.

The manual also discusses CFP's disciplinary policy, explaining that "[CFP] uses progressive discipline to ensure staff compliance with performance standards, ethics and conduct."

4

The manual sets forth various levels of disciplinary action, ranging from verbal warnings to dismissal. The policy specifies that each step in the disciplinary process will be documented and placed in the disciplined employee's file.

### C. *Mr. Dormevil's Performance and Termination*

In his affidavit, Mr. Reardon sets forth the problems he had with Mr. Dormevil's job performance leading to the decision to terminate Mr. Dormevil at the end of his three-month introductory period.

According to Mr. Reardon, on several occasions Mr. Dormevil failed to ensure that the Richardson House was adequately staffed and failed to obtain necessary coverage during his own absences. Mr. Dormevil also failed to supervise both the staff and the residents of the Richardson House adequately, with the result that various rule infractions went unreported. Mr. Reardon also received reports from both staff members and residents at Richardson House that Mr. Dormevil had an inappropriately confrontational and unprofessional attitude.

As a consequence of these concerns, Mr. Reardon and Ms. Cloete made the decision to terminate Mr. Dormevil's employment and did so on August 21, 2008. Mr. Reardon provided Mr. Dormevil with a letter setting out the reasons above as the basis for his firing.

In his deposition, Mr. Dormevil testified that all of the reasons set forth in his termination letter were false. In addition, CFP failed to document any of these complaints prior to his termination. He explains that no documents regarding these incidents were provided to him and that he has received no statements or affidavits from the staff members or residents who allegedly complained about his behavior. He also contends that he was not provided with adequate training or supervision during his introductory period of employment with CFP.

Mr. Reardon, in both his affidavit and in his deposition, explained that it is not the practice of CFP to document disciplinary issues that arise during the three-month introductory period. Mr. Reardon also states that he counseled Mr. Dormevil regarding his performance on multiple occasions and that he scheduled three meetings to discuss Mr. Dormevil's performance with him, but that Mr. Dormevil failed to appear for these meetings.

After Mr. Dormevil was terminated from CFP, he was replaced by another male.

### D. *The Hiring, Performance, and Discipline of Other CFB Employees*

On the same date that Mr. Dormevil was hired, CFP hired a female employee named Jana Nally. Ms. Nally was hired as a treatment coordinator, a position which has different job responsibilities than a house manager and which required both a

master's degree and a greater level of experience than the house manager position. Mr. Dormevil contends that Ms. Nally was provided with a greater level of supervision and training than he received during his probationary period and that this disparate level of supervision and training evidences gender discrimination.

## II. PROCEDURAL BACKGROUND

### A. *Mr. Dormevil's Complaint to the Massachusetts Commission Against Discrimination*

Mr. Dormevil filed a discrimination complaint against CFP with the Massachusetts Commission Against Discrimination on January 5, 2009. In that complaint, Mr. Dormevil alleged that he had been fired on the basis of gender discrimination and that, while he received little or no instruction regarding his job responsibilities, Ms. Nally received greater instruction and had supervisors available to respond to any issues she had.

After performing an investigation, the MCAD issued a report on April 30, 2011 finding that there was a lack of probable cause to believe that CFP had engaged in gender discrimination when terminating Mr. Dormevil. The report explained that he "failed to provide any information that would lead a reasonable person to believe [CFP] had discriminated against him on the basis of sex." Mr. Dormevil appealed this decision and it was affirmed in a ruling by the MCAD on July 26, 2011.

7

Following the denial of his appeal, Mr. Dormevil filed a complaint in this court on February 15, 2012.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). The question is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *See Adria Int'l Group, Inc.* v. *Ferre Dev.*, Inc., 241 F.3d 103 (1st Cir. 2001); *Wightman* v. *Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996). Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. *Reich* v. *John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

## IV. DISCUSSION

### A. *Mr. Dormevil's Gender Discrimination Claim*

In his complaint, Mr. Dormevil has not specified the statute or other rule that he believes CFP has violated by terminating his employment for reasons stemming from gender bias.

Absent a specific alleged grounds for the claims, I will test the claims against the standard articulated by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-805 (1973). The *McDonnell Douglas* standard, although developed in the context of claims brought under Title VII of the Civil Rights Act, has also been applied to claims for intentional discrimination under 42 U.S.C. § 1981, *T&S Associates, Inc.* v. *Crenson*, 666 F.2d 722, 724 (1st Cir. 1981), and claims brought under Mass. Gen. Laws c. 151B, *Wheelock College* v. *Massachusetts Commission Against Discrimination*, 355 N.E.2d 309, 314-15 (Mass. 1976).

Under the *McDonnell Douglas* standard, the plaintiff must establish a prima facie case of discrimination. *Johnson* v. *Univ. Of Puerto Rico*, 714 F.3d 48, 53 (1st Cir. 2013). "If a prima facie case is established, 'the burden of production—but not the burden of persuasion—shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action.'" *Id.* at 54 (citing *Lockridge* v. *Univ. of Me.*

9

*Sys.*, 597 F.3d 464, 470 (1st Cir. 2010). If the employer meets that burden, the plaintiff then must demonstrate by a preponderance of the evidence that the employer's proffered reason is pretextual and the actual reason for the termination is discriminatory. *Id.* (citations omitted).

A prima facie case is made by showing the plaintiff: (1) is a member of a protected class; (2) performed his job satisfactorily; (3) experienced an adverse employment action; and (4) was replaced by a person with roughly equivalent job qualifications who is not a member of his protected class. *See Ayala-Gerena* v. *Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996).

Mr. Dormevil cannot make this prima facie showing. Although he satisfies the first and third prongs of this test, he clearly fails the fourth--his replacement was another male. Because of this, he cannot make out this basic prima facie claim for gender discrimination.

In addition, evidence supporting a finding that Mr. Dormevil satisfactorily performed his job responsibilities is inadequate, consisting solely of Mr. Dormevil's deposition testimony that he believes he was doing a "great job" and that the concerns outlined in his termination letter were all false.

Even assuming, *arguendo*, that these statements from Mr. Dormevil were sufficient to satisfy the second prong of the prima

10

facie test and that the fourth prong is ignored, the next stages of the *McDonnell-Douglas* framework pose insurmountable hurdles. CFP has undoubtedly articulated a non-discriminatory reason for Mr. Dormevil's termination. The reasons are set forth both in Mr. Reardon's affidavit and in the letter provided to Mr. Dormevil at the time of his termination. Mr. Reardon identifies the failure to supervise staff at the Richardson House, as Mr. Dormevil was required to do, the failure of Mr. Dormevil to obtain coverage during times that he was absent from work, the failure of Mr. Dormevil to enforce the CFP's rules at the Richardson House, and Mr. Dormevil's confrontational attitude towards other staff and towards Richardson House clients as the reasons for the termination of Mr. Dormevil from employment at CFP.

Although, as noted above, Mr. Dormevil has expressed his belief that his performance was satisfactory and the performance-related charges against him false, he has produced no evidence to suggest that Mr. Reardon and Ms. Cloete did not believe these stated reasons to be genuine, or that these proffered reasons were a pretext for discriminatory animus. *See Caesar* v. *Shinseki*, 887 F. Supp. 2d 289, 299 (D. Mass. 2012) (In assessing pretext, the focus is on "the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.") (citations and quotation marks omitted). To the

extent that Mr. Dormevil seeks to use Ms. Nally as a comparison and suggests that the differential treatment she received demonstrates gender bias, this attempt fails because Ms. Nally is not a similarly situated employee. To the contrary, she held a different role, requiring different qualifications and with different responsibilities. Moreover, there is no evidence that Ms. Nally engaged in any conduct similar to that which led to Mr. Dormevil's dismissal. Although comparator evidence need not present a perfect match, "[a] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects." *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996).

Mr. Dormevil's claim for gender discrimination fails because he has not set forth any evidence which shows--or even suggests-- that the reason for his termination was gender bias, rather than the performance-related reasons set forth by CFP. I will therefore grant summary judgment in favor of CFP on Mr. Dormevil's claim for gender discrimination.

### B.   *Mr. Dormevil's Breach of Contract Claim.*

Although he asserted only claims for gender discrimination in his complaint, Mr. Dormevil adverts to the terms of CFP's policy manual in his motion for summary judgment, and claims that CFP violated those terms in connection with his employment.

Any breach of contract claim predicated on the terms of the Personnel Manual fails for two reasons. First, the Personnel Manual does not impose contractual obligations upon CFP. Second, even if the Personnel Manual were to be treated as a contract, that manual makes clear that CFP employs its staff on an "at-will" basis, meaning that CFP can terminate its employees at any time, with or without cause.

1. <u>The Personnel Manual is Not a Contract</u>

The Massachusetts Supreme Judicial Court has explained that, upon proper proof, a employer's personnel manual may, but does not always, form the basis for an express or implied contract. *Hobson* v. *McLean Hosp. Corp.* 522 N.E.2d 975 (Mass. 1988). In *Jackson* v. *Action for Boston Community Dev. Inc.*, 525 N.E.2d 411 (Mass. 1988), the SJC identified several factors useful in determining whether an employment manual imposes contractual obligations upon an employer. These factors include: (1) whether the employer retained the right to modify unilaterally the manual's terms; (2) whether the manual provided that it was for "guidance" as to the employer's policies; (3) whether there was negotiation between the employer and the employee regarding the terms of the manual; (4) whether the manual stated a term of employment; (5) whether the employer called special attention to the manual; and (6) whether the employee signed or manifested his assent to the manual or acknowledged that he understood its

terms. *Id.* at 415-16. The SJC has since observed that the circumstances identified in *Jackson*, are "not a rigid list of prerequisites, but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." *O'Brien* v. *New England Tel. & Tel. Co.*, 664 N.E.2d 843, 847 (Mass. 1996). The central question (upon which those factors shed light) is whether an employee "would reasonably conclude that the employer was presenting the manual as a statement of the conditions under which employment would continue." *Id.*

The factors identified in *Jackson*--along with the surrounding circumstances--demonstrate that CFP's Personnel Manual does not constitute an employment contract. CFP expressly retained the right to modify the terms of the agreement at any time unilaterally, the manual stated that it "should be regarded as management guidelines only," there was no negotiation between CFP and Mr. Dormevil regarding the terms of the manual, and the manual set forth no term of employment. Finally, although CFP expressly called attention to the terms of the manual at the time of Mr. Dormevil's hiring and he signed a document acknowledging receipt of the manual, the document that Mr. Dormevil signed explains that the manual is provided "for the information and guidance of employees working at [CFP]" and makes explicit that

his employment was "terminable-at-will, so that both [CFP] and I remain free to end our work relationship at any time, with or without notice." Given this language, it would be impossible for a reasonable fact-finder to conclude that CFP was presenting the Personnel Manual as setting forth conditions under which employment with CFP would continue.

2. The Personnel Manual Makes Clear That Employment at CFP is "At-Will."

Even if it were appropriate to consider the CFP Personnel Manual as setting forth the terms of Mr. Dormevil's employment, CFP's decision to terminate Mr. Dormevil's employment would not violate those terms. In two different sections, the manual makes clear that employment with CFP is on an "at-will" basis, and that employees may be terminated at any time. "Employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Jackson*, 525 N.E.2d at 412.

Even if Mr. Dormevil's performance had been satisfactory, as he claims, CFP's decision to fire Mr. Dormevil would not abrogate any contractual right that might have been established by the Personnel Manual. Accordingly, any breach of contract claim fails on this basis as well.

C. *Mr. Dormevil's Claims for Defamation*

In a document setting forth his calculation of damages--but not in his complaint--Mr. Dormevil makes reference to a claim for

15

defamation, predicated on the statements made by CFP in the termination letter provided to him about his performance.

Under Massachusetts law, a plaintiff must prove the following elements to establish a claim for defamation: (1) the defendant made a statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; (3) the defendant was at fault in making the statement; and (4) the statement either caused the plaintiff economic loss or is actionable without proof of economic loss. *Ravnikar* v. *Bogojavlensky*, 782 N.E.2d 508, 510-11 (Mass. 2003).

Mr. Dormevil has made no showing that the termination letter was published to any third party and at the hearing in this matter conceded he was aware of no such publication.[1] Accordingly, any statements therein may not be the basis for a defamation claim.

## V. CONCLUSION

For the reasons set forth more fully above, Defendant's motion for summary judgment (Dkt. No. 46) is hereby GRANTED. Plaintiff's motion for summary judgment (Dkt. No. 45) is DENIED.

---

[1] Moreover, even had there been a publication to a third party, the plaintiff has made no showing sufficient to overcome the employer's conditional privilege to disclose defamatory information. *See generally Bratt* v. *IBM Corp.*, 467 N.E.2d 126 (Mass. 1984).

The Clerk of the Court is ordered to enter judgment in favor of the defendant, Communities for People, Inc.

 

***/s/ Douglas P. Woodlock***
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE